# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CITY OF ONALASKA, individually, and on
behalf of all others similarly situated,

                            Plaintiff,

   v.

OSHKOSH CORPORATION; REV GROUP,
INC., ROSENBAUER AMERICA LLC, and
FIRE APPARATUS MANUFACTURERS'
ASSOCIATION,

                          Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................... 1

II.     SUMMARY .......................................................................... 1

III.    JURISDICTION AND VENUE ............................................... 3

IV.     PARTIES ............................................................................ 4
        A.  Plaintiff .................................................................... 4
        B.  Defendants ................................................................ 5
            a)  Trade Association Defendant ................................. 5
            b)  Manufacturer Defendants ..................................... 5
                1)  Oshkosh Corporation ..................................... 5
                2)  REV Group, Inc. ........................................... 5
                3)  Rosenbauer America LLC ............................... 6
            c)  Co-Conspirators and Agents ................................. 6

V.      FACTUAL ALLEGATIONS .................................................... 7
        A.  Relevant Market ......................................................... 7
        B.  History of the Fire Truck Industry's Consolidation ............. 9
            1. REV Group's History of Consolidation ........................ 10
            2. Oshkosh's History of Consolidation .......................... 12
            3. Rosenbauer's History of Consolidation ...................... 13
            4. Manufacturer Defendants' Cooperation ...................... 14
        C.  The Fire Apparatus Manufacturers Association .................. 15
            1.  FAMA Membership .............................................. 15
            2.  FAMA Spring and Fall Meetings .............................. 16
            3.  FAMA Quarterly and Annual Statistical Reports ........... 17
        D.  Defendants' Successful Suppression of the Supply of Fire Trucks ...... 18
            1. Fire Truck Backlogs Quadrupled During the Class Period ........... 18
            2. Despite Increasing Demand, Manufacturer Defendants Decided   Against
               Increasing Their Manufacturing Capacity ........................ 21
        E.  Defendants' Successful Inflation of the Price of Fire Trucks Above Competitive
            Levels ........................................................................ 24
                1.   Fire Truck Prices Have Doubled During the Class Period ................... 24
                2.   Manufacturer Defendants Used "Floating Prices" to Increase Their
                     Profits During the Class Period ............................... 25
                3.   Manufacturer Defendants' Revenues Soared ........................ 26
        F.  Defendants' Suppression of Competition Through Information Exchange .......... 27
        G.  Plaintiff and Other Class Members were Harmed by Defendants ..................... 28
        H.  Communities Across the US Have Suffered from Defendants' Conduct ............. 29

VI.     ANTITRUST INJURY AND DAMAGES ................................................. 31

i

VII.    CLASS ACTION ALLEGATIONS ........................................................... 32

VIII.  FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ....................... 35

IX.    CONTINUING VIOLATION ................................................................... 36

X.     CLAIM FOR RELIEF .......................................................................... 38

XI.    REQUEST FOR RELIEF ...................................................................... 81

XII.   DEMAND FOR JURY TRIAL ............................................................... 82

# I. INTRODUCTION

1. Plaintiff City of Onalaska ("Plaintiff") brings this action individually and on behalf of all other similarly situated purchasers. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal and state antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges the following based on personal knowledge as to the facts pertaining to Plaintiff and based on information and belief as to all other matters.

# II. SUMMARY

2. Plaintiff brings this suit against Defendants for their unlawful contract, combination, or conspiracy to suppress the supply and raise the prices of Fire Trucks sold throughout the United States.[1]

3. Defendants are Fire Truck manufacturers Oshkosh Corporation ("Oshkosh"); REV Group, Inc. ("REV Group"); and Rosenbauer America LLC ("Rosenbauer America") (collectively "Manufacturer Defendants"), and industry trade association Fire Apparatus Manufacturers' Association ("FAMA") (collectively with other Manufacturer Defendants, "Defendants").

4. Manufacturer Defendants are the largest manufacturers of Fire Trucks in the United States, controlling between 70 to 80 percent of the United States Fire Trucks market. Manufacturer Defendants are direct competitors.

5. FAMA is the primary trade association for the Fire Truck industry, and its exclusive membership consists of manufacturers of Fire Trucks, specifically excluding consumers.

---

[1] As defined below, "Fire Trucks" consist of vehicles recognized by the National Fire Protection Association ("NFPA") Standard 1900, Standard for Automotive Fire Apparatus, and the National Wildfire Coordinating Group ("NWCG") Standards.

1

6.      FAMA enabled Manufacturer Defendants to exchange competitively sensitive, nonpublic information and monitor compliance with the conspiracy.

7.      To accomplish the anticompetitive aims of the conspiracy, Defendants engaged in a continuous and multi-faceted exchange of competitively sensitive information through FAMA, which suppressed supply and price competition and permitted Defendants to monitor each other's adherence to the conspiracy. FAMA collects nonpublic, competitively sensitive information from members and then shares that information with other members in a give-to-get information sharing scheme.

8.      In a competitive market, this kind of sensitive business information would allow industry participants to undercut each other on price and take market share. Thus, it would be contrary to a firm's self-interest to share such information with competitors. In a cartel, however, access to this kind of information serves as reassurance that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.

9.      Moreover, FAMA creates myriad opportunities for Defendants to meet in person and exchange sensitive information, including its spring and fall meetings.

10.     Beginning no later than January 1, 2016, Defendants conspired, colluded, and entered into an agreement to artificially suppress supply and raise prices of Fire Trucks at supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Class paying supracompetitive prices for Fire Trucks in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Among the victims of the conspiracy are fire departments, municipalities, and entities that purchased Fire Trucks from the Manufacturer Defendants (including the Nationwide

2

Class and State Law Class Members, defined below, together referred to as "Class Members" or "the Class"). Plaintiff, on behalf of itself and Class Members, seeks to recover the overcharges they paid.

## III.  JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). This court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiff's state law claims derive from the same common nucleus of operative fact as their federal claims. Plaintiff brings state law class claims on behalf of the State Law Class to recover actual and/or compensatory damages, treble damages, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply and increasing the price of Fire Trucks. Plaintiff seeks damages in excess of $5,000,000.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because, at all times relevant to the Complaint, one or more of the Defendants resided in this District, and all Defendants transacted business, were found, or had agents in this District.

15.     This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing

3

injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

16.     Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## IV.     PARTIES

**A.     Plaintiff**

17.     Plaintiff City of Onalaska is a city in Wisconsin. Since January 1, 2016, the City of Onalaska has indirectly purchased Fire Trucks from Manufacturer Defendants. The Fire Trucks that Plaintiff purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

18.     In 2018, Plaintiff purchased a Pierce Impel Engine for $550,593. The build time for this Fire Truck was 11 to 12 months.

19.     In 2021, Plaintiff purchased a Pierce Impel Ladder Truck for $989,170. The build time for this Fire Truck was 12.5 to 14.5 months.

20.     In 2025, Plaintiff purchased a Pierce Velocity Pumper Tanker for $1,119,921. The build time is estimated to be 52 to 55 months, meaning that Plaintiff will not receive this Fire Truck until at least 2029. If the cost for materials increases over the next 4 to 5 years, then Plaintiff will have to pay more for this Fire Truck that is currently on order.

4

**B.** **Defendants**

    **a) Trade Association Defendant**

21.    Defendant Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association with its primary place of business in Ocala, Florida.

22.    Throughout the Class Period, FAMA was an active participant in the conspiracy to suppress the supply and raise the prices of Fire Trucks in the United States. FAMA facilitated exchanges among the Manufacturer Defendants of non-public, competitively sensitive information regarding, including among other things, prices, capacity, demand, sales volume, future sales strategy, and other key pricing and sales metrics in furtherance of the conspiracy.

    **b) Manufacturer Defendants**

    **1) Oshkosh Corporation**

23.    Defendant Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin with its primary place of business in Oshkosh, Wisconsin. Throughout the Class Period, Oshkosh produced and sold Fire Trucks and participated in a conspiracy to suppress the production and raise the prices of Fire Trucks in the United States. Oshkosh's annual revenue is approximately $750 million for its Fire Truck sales, which accounts for approximately 25 percent of the total annual revenue of the $3 billion United States Fire Truck market.

24.    Oshkosh sells its Fire Trucks under a variety of brand names, including but not limited to Pierce Manufacturing, Inc. and Maxi-Metal, Inc., through a network of dealerships to customers in all 50 states.

    **2) REV Group, Inc.**

25.    Defendant REV Group, Inc. ("REV Group") is incorporated in Delaware with its primary place of business in Brookfield, Wisconsin. Throughout the Class Period, REV Group

produced and sold Fire Trucks and participated in a conspiracy to suppress the production and raise the prices of Fire Trucks in the United States. REV Group's annual revenue is approximately $1 billion for its Fire Truck sales, which accounts for approximately 33 percent of the total annual revenue of the $3 billion United States Fire Truck market.

26.     REV Group sells its Fire Trucks under a variety of brand names, including but not limited to E-ONE, Inc., Ferrara Fire Apparatus, Spartan Emergency Response and Spartan Fire Apparatus and Chassis, and Smeal Fire Apparatus, through a network of dealerships to customers in all 50 states.

### 3) Rosenbauer America LLC

27.     Defendant Rosenbauer America LCC ("Rosenbauer America") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), an Austrian based company. Rosenbauer is incorporated in Delaware with its primary place of business in Lyons, South Dakota. Throughout the Class Period, Rosenbauer produced and sold Fire Trucks and participated in a conspiracy to suppress the production and raise the prices of Fire Trucks in the United States. Rosenbauer's annual revenue is approximately $300 million for its Fire Truck sales, which accounts for approximately 10 percent of the total annual revenue of the $3 billion United States Fire Truck market.

28.     Rosenbauer sells its Fire Trucks through a network of dealerships to customers in all 50 states.

### c) Co-Conspirators and Agents

29.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management,

6

direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

30.     Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of Fire Trucks. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

## V.     FACTUAL ALLEGATIONS

### A.     Relevant Market

31.     This action alleges that Defendants' coordinated horizontal conduct was a *per se* violation of the federal antitrust laws. Plaintiff also alleges that under Section 1 of the Sherman Act, Defendants' agreement to unlawfully exchange competitively sensitive information amongst Fire Truck manufacturers violates the rule of reason.

32.     Defendants compete in the Fire Truck industry for sales of Fire Truck customers. The agreement, to exchange competitively sensitive information through FAMA, has enabled Defendants to reduce competition in the market for Fire Trucks.

33.     For antitrust purposes, the principal relevant market to this claim is the "Fire Trucks" market.

34.     The conspiracy involves Fire Trucks recognized by the National Fire Protection Association ("NFPA") Standard 1900, Standard for Automotive Fire Apparatus, and the National Wildfire Coordinating Group ("NWCG") Standards (collectively, the "Industry Standards").

7

According to the Industry Standards, there are seven types of Fire Trucks, which are all at issue in this conspiracy:

| Engine Typing Standard | | | | | | | |
|---|---|---|---|---|---|---|---|
| Types 1 and 2 are structure; Types 3-7 are wildland | | | | | | | |
| Requirements | Type 1 | Type 2 | Type 3 | Type 4 | Type 5 | Type 6 | Type 7 |
| Tank Minimum Capacity (gal) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| Pump Minimum Flow (gal/min) | 1,000 | 500 | 150 | 50 | 50 | 50 | 10 |
| At Rated Pressure (psi) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| Hose: 2 1/2-inch | 1,200 | 1,000 | N/A | N/A | N/A | N/A | N/A |
| Hose: 1 1/2-inch | 500 | 500 | 1,000 | 300 | 300 | 300 | N/A |
| Hose: 1-inch | N/A | N/A | 500 | 300 | 300 | 300 | 200 |
| Ladders per NFPA 1900 | Yes | Yes | N/A | N/A | N/A | N/A | N/A |
| Master Stream 500 gal/min. | Yes | N/A | N/A | N/A | N/A | N/A | N/A |
| Pump and Roll | N/A | N/A | Yes | Yes | Yes | Yes | Yes |
| Maximum GVWR (lb) | N/A | N/A | N/A | N/A | 26,000 | 19,500 | 14,000 |
| Personnel (minimum) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |

*Image 1: Fire Truck types.*

35.    Fire Trucks are necessary pieces of equipment for fire departments. There is no alternative product to a Fire Truck for fighting fires. Notably, as evidenced by the devastating fires in Los Angeles in 2025, when municipalities and other entities lack sufficient Fire Trucks, they are unable to combat deadly fires.

36.    According to the U.S. Fire Administration, there are approximately 30,000 fire departments and 52,000 fire stations in the United States. Every fire department across the country needs a Fire Truck, meaning that there are at least thousands of fire departments, municipalities, and entities across the United States that purchased Fire Trucks during this conspiracy.

37.    Fire Trucks are extremely costly. Due to Defendants' conspiracy, a pumper truck, which is a type of Fire Truck, now costs approximately $1 million. A ladder truck, another type of Fire Truck, now costs approximately $2 million.

38.    For antitrust purposes, the relevant geographic market is the United States.

8

39.     Defendants' conspiracy to suppress supply and raise prices of Fire Trucks impacted purchasers of Fire Trucks across the entire United States. As noted, thousands of municipalities and entities representing every state require Fire Trucks. Therefore, it is appropriate to analyze the competitive effects of the Defendants' actions in the United States as a whole.

40.     Defendants and their co-conspirators possessed market power at all relevant times in the manufacturing and sales levels of the Fire Trucks supply chain in the United States. Market power at each level of the supply chain made possible a scheme to significantly raise prices above competitive levels without risking losing a proportional number of sales.

41.     Fire Trucks are highly specialized, expensive, made-to-order equipment. And even without the backlogs that Manufacturer Defendants now report, Fire Trucks can take months to make, which means that only established and well-funded corporations can afford the up-front investment required to enter the market. Further, manufacturers must have access to highly technical engineering expertise to meet the various standards for Fire Trucks, which provides another deterrent to prospective market entrants.

42.     These high barriers to entry protect Manufacturer Defendants' market shares.

B.     **History of the Fire Truck Industry's Consolidation and Statements Evidencing Anticompetitive Intent**

43.     In the post-war decades of the 1950s and 1960s, the modern Fire Truck manufacturing industry flourished. Small and midsized Fire Truck manufacturing firms, which were typically family-owned operations, were abundant across the United States and ready to manufacture Fire Trucks tailored to the needs of local fire departments. For the decades that followed, the industry was competitively diversified with at least two dozen companies manufacturing Fire Trucks. These smaller firms competed against each other, which ensured that

9

Fire Truck prices remained near costs and that there was a surplus of manufacturing capacity to meet demand.

44.    The Fire Truck industry enjoyed relative stability until 2008, when the Great Recession hit. Prior to the Great Recession, the number of Fire Trucks ordered per year was approximately 6,000. But once the Great Recession hit, and municipal budgets tightened, these numbers plummeted to around 3,000 a year.

45.    Around the same time, a private equity group, American Industrial Partners (AIP), began its efforts to consolidate the Fire Truck industry. AIP was able to acquire E-ONE, Inc. ("E-ONE"), but most smaller and midsized manufacturing firms were resistant to acquisition. As late as 2015, there were still approximately 24 companies manufacturing Fire Trucks in the United States. All of these manufacturers were independent or owned by a separate parent company.

### 1.    REV Group's History of Consolidation

46.    In 2015, AIP created REV Group from the merger of several companies. Around the same time, in 2016, when state and local budgets had rebounded from the Great Recession, demand for Fire Trucks increased, reaching between 4,000 to 5,000 orders annually. REV Group's offers became too good to refuse, and it began consolidating the Fire Truck industry in earnest.

47.    In 2016, REV Group acquired Kovatch Mobile Equipment Corporation ("KME"), a leading manufacturer in the Mid-Atlantic region, with operations in Pennsylvania, Virginia, New York, and California.

48.    KME's acquisition was followed by Ferrara Fire Apparatus, Inc. ("Ferrara") in 2017. Based in Louisiana, Ferrara had been a direct competitor to E-ONE in the South. At this point, REV Group told investors it controlled approximately 44 percent of annual Fire Truck and ambulance sales.

10

49.     Although it had a powerful position in the market after acquiring E-ONE, KME, and Ferrara, REV Group wasn't finished: REV Group continued its consolidation spree, acquiring Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively, "Spartan") and Smeal Fire Apparatus ("Smeal") in 2019. Both Spartan and Smeal were two of the leading manufacturers in the Midwest region. And in 2020, REV Group purchased Ladder Tower Company ("Ladder Tower"), which was based in the Mid-Atlantic region in Pennsylvania.

50.     REV Group's acquisitions made it the dominant Fire Truck manufacturer, and its consolidation of the Fire Truck industry demonstrates that the market is ripe for collusion.



*Image 2: REV Group's history of consolidation.*

51.     In contrast to the competition that used to exist between the smaller and midsize manufacturers, REV Group made clear that "negative" competition among subsidiaries would not be tolerated.

52.     In an investor presentation, REV Group labeled itself as "an industry consolidator." Using a "center-led" strategy with REV Group dictating "margin improvement actions" across its

11

subsidiaries, REV Group planned to eliminate geographic overlap between the marketing of its different Fire Truck brands. In the same presentation, REV Group called for its subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings.

53.     Timothy Sullivan, Rev Group's chief executive, had a plan to get all acquired companies, who were operating with a profit margin of 4 to 5 percent, to "above that 10 percent level." To achieve this goal, REV Group would consolidate and suppress competition. As Sullivan stated, "[y]ou bring them into the fold, you got to give them the religion, and they've got it now."

**2.     Oshkosh's History of Consolidation**

54.     Following a period of significant acquisition by REV Group, Oshkosh began making its own acquisitions. In 2021, Pierce Manufacturing Inc. ("Pierce"), Oshkosh's leading North American brand, acquired Boise Mobile Equipment ("BME"). Acquiring BME allowed Oshkosh to expand its power in the West Coast market. Then in 2022, Oshkosh acquired Maxi-Metal, Inc, a Canadian Fire Trucks manufacturer.

55.     Oshkosh also took steps to eliminate competition among its subsidiaries by consolidating its U.S. brands and reducing geographic overlap between its dealers.

56.     In 2018, Pierce dealer MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment ("Schuhmacher"). MacQueen was the authorized Pierce dealer for Minnesota, Nebraska, South Dakota, and North Dakota, and Schuhmacher served 108 counties in Missouri. Through its acquisition of Schuhmacher, MacQueen expanded its territory to Missouri, thereby consolidating its control in the Midwest market.

57.     In 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons-Martin") acquired Superior Equipment ("Superior"). Siddons-Martin served the Texas, Louisiana, and New

12

Mexico markets. Through its acquisition of Superior, Siddons-Martin expanded its territory to Utah and Nevada. That same year, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment ("Churchville"). Through its acquisition of Churchville, Firematic further expanded its Northeast territory to include Connecticut and New York.

58.     In 2025, Pierce dealer Reliant Fire Apparatus ("Reliant") acquired Halt Fire, Inc. ("Halt"). Through its acquisition of Halt, Reliant consolidated its "exclusive Pierce territory" to include Michigan, in addition to Wisconsin and Iowa.

### 3.     Rosenbauer's History of Consolidation

59.     In response to REV Group's and Oshkosh's attempts to consolidate the Fire Trucks market, Rosenbauer America also made efforts to consolidate. In 2022, Rosenbauer International A.G. acquired the remaining 25 percent minority stake in Rosenbauer America from General Safety Equipment Corporation.

60.     In 2023, Rosenbauer partnered with IKON Fire, LLC to expand its dealer network to Colorado and Wyoming.

61.     Similar to REV Group's elimination of geographic overlap with its dealers, Rosenbauer dealers are assigned non-overlapping territories, which reduces competition among its dealers.

13



*Image 3: Rosenbauer America dealer map.*

**4.     Manufacturer Defendants' Cooperation**

62.     Not only have Manufacturer Defendants suppressed competition between their own brands, but as they each consolidated control over the Fire Truck market, they sought to cooperate with one another.

63.     As direct competitors, Manufacturer Defendants should be competing with each other. Instead, they have sought out ways to cooperate. In 2022, Jerry Halpin, co-owner and Vice President of Sales and Marketing for C.E.T. Fire Pumps, observed that "people in the fire service industry are talking amongst themselves" and are looking "to bolster opportunities through partnerships and other alliances." Looking toward the future, Mr. Halpin predicted "cooperation between like businesses to gain an edge in the marketplace."

64.     Manufacturing Defendant executives echo this cooperative sentiment. Mike Virnig, REV Group's Vice President of Sales in the Fire Group, stated, "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even

14

get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"

65. REV Group executives have also told analysts that they would substantially raise profit margins and that other companies were doing the same.

## C. The Fire Apparatus Manufacturers' Association

66. Manufacturer Defendants' cooperation went beyond an abstract desire to see everyone in the industry succeed. Their desire to cooperate manifested in an unlawful scheme to suppress the supply and raise the prices of Fire Trucks in the United States.

67. Manufacturer Defendants exchanged nonpublic, competitively sensitive information to maintain their conspiracy to suppress production and raise the prices of Fire Trucks by colluding with FAMA.

### 1. FAMA Membership

68. FAMA is the primary Fire Trucks trade group and is only open to Fire Truck manufacturers; purchasers may not join. FAMA has over 125 member companies throughout North America. There are significant incentives to join FAMA: membership allows access to members-only benefits like attending the spring and fall FAMA meetings and access to statistical reports provided quarterly and summarized at year end.

69. Membership applications for FAMA are only open to qualified business entities that have manufactured for commercial resale any of the following products: (A) fire fighting or fire protection apparatus, including rescue vehicles and command vehicles intended for use in emergency service (collectively called "fire apparatus"); (B) components or products which are later incorporated by the fire apparatus manufacturer as a permanent part of the completed fire apparatus; or (C) products specifically designed for fire service applications that are affixed to, or

15

carried upon, the fire apparatus for use in conjunction with the fire apparatus in performing its fire fighting, rescue or command function. Notably, municipalities and entities that purchase Fire Trucks do not qualify for membership.

70.     Oshkosh, REV Group, and Rosenbauer America are all horizontal competitors in the Fire Truck market. Maxi-Metal, Inc. and Pierce Manufacturing, which are subsidiaries of Oshkosh, are members of FAMA. Spartan Emergency Response, Ferrara Fire Apparatus, Inc., E-ONE, Inc., KME Fire Apparatus, which are subsidiaries of REV Group, are members of FAMA. Rosenbauer America is a member of FAMA.

**2.      FAMA Spring and Fall Meetings**

71.     FAMA members-exclusive events allow horizontal-competitors to discuss shared financial interests regarding Fire Trucks. FAMA's spring and fall meetings provided Defendants opportunities to meet and conspire about suppressing supply and raising prices of Fire Trucks without the presence of consumers.

72.     FAMA boasts, as one of its incentives to become a member, that "FAMA's spring and fall meetings . . . provide a forum to share information."

**RELATIONSHIPS**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulation of organizational goals and provide a forum to share information.

*Image 4: FAMA's spring and fall meetings graphic.*

73.     At these meetings, FAMA members, who are direct competitors with each other, engage in "purchasing roundtables," and members-only meetings and discussion groups. These various closed-door meetings allow Defendants to exchange competitively sensitive, nonpublic information, coordinate the suppression of Fire Truck supply, and raise Fire Truck prices.

16

74.     These twice-annual meetings are not the only method that FAMA provides to facilitate communications between Defendants. FAMA also "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."

### 3.     FAMA Quarterly and Annual Statistical Reports

75.     In addition to its spring and fall meetings, FAMA advertises its collection and dissemination of competitors' data as one "of the most powerful benefits of FAMA membership."

76.     FAMA dedicates an entire committee, the Data & Research Committee, to collecting and disseminating this data. The Data & Research Committee helps FAMA members by "providing actionable data for strategic business planning" through "collect[ing] and distribut[ing] data regarding apparatus sales and orders on a quarterly basis."

77.     John Schultz, the Vice President and General Manager of Pumper Products at Pierce Manufacturing is the committee's Vice-Chair.

78.     Members may choose to provide nonpublic, competitively sensitive information to the Data & Research Committee through a digital portal. The committee then sends the data to an accounting firm, which in turn compiles the data and then sends it back to the committee. The Data & Research Committee then shares the data with members in quarterly reports.

79.     These reports are not available to just anyone. "Only those companies that participate in the statistical studies and members are privy to these reports." FAMA makes it explicitly clear that it "does not release this information to the public." In other words, members participate in a give-to-get scheme whereby they gain access to their direct competitors' nonpublic, competitively sensitive information if they share their own nonpublic, competitively sensitive information.



FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 5: FAMA's industry statistics graphic.*

**D.      Defendants' Successful Suppression of the Supply of Fire Trucks**

      **1.      Fire Truck Backlogs Quadrupled During the Class Period**

80.      Defendants' agreement to suppress supply of Fire Trucks and to exchange nonpublic, competitively sensitive information regarding Fire Trucks has had the intended effect of artificially suppressing the supply of Fire Trucks.

81.      When state and local budgets began recovering from the Great Recession, demand for Fire Trucks increased, reaching between 4,000 to 5,000 orders annually from the mid-2010s until 2020. Then, between 2020 and 2022, demand spiked as municipal and state budgets expanded with COVID relief money. Since approximately 2022, there have been approximately 5,500 to 6,500 Fire Truck orders per year.

82.      Despite this increased demand, Manufacturer Defendants' production has not increased, resulting in ever-expanding backlog orders.

83.      Before 2020, REV Group had a backlog of roughly $1 billion worth of fire department orders. In 2023, REV Group reported a $3.6 billion backlog, which was a 41 percent increase over 2022. By October 2024, REV Group's backlog had increased again, up to $4.4 billion.

18

84.     Oshkosh's backlog of Fire Truck orders quadrupled from 2019 to 2023, when it reported approximately $4 billion in orders placed but not fulfilled.

85.     Rosenbauer also has a ballooning backlog of Fire Truck orders. At the end of 2024, Rosenbauer reported an approximately $2.66 billion backlog. By the beginning of 2025, the backlog had already increased to approximately $2.73 billion.

86.     Because of the ballooning backlogs, Fire Truck purchasers have had to wait increasingly long periods to receive their Fire Truck orders. For some, wait times have more than quadrupled from 1 year to 4.5 years.

87.     Those impacted by these backlogs have publicly vented their frustrations. In an online forum for Fire Truck purchasers, one user reported that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years." Another user lamented that they had purchased Fire Trucks from Rosenbauer "in the past two years" and "none have been delivered." A third was told by Pierce that 48 months "is the going time for any new orders" for a "very cookie cutter rescue body."

88.     After waiting for years for their Fire Trucks, purchasers may have to wait even longer when Manufacturer Defendants push back the anticipated delivery date. One user commented that their town had ordered a Fire Truck from REV Group and in late 2022 REV Group "added 15 months to the delivery time."

89.     REV Group has used the increase in orders as a pretext for explaining the delays. But on September 10, 2025, the U.S. Senate Subcommittee on Disaster Management held a hearing ("the September 10th Senate hearing") on the price and backlog crisis facing U.S. fire departments, and Senator Josh Hawley responded to REV Group's pretextual excuses, stating, "If that were the

19

truth, you wouldn't have shut down production lines, you wouldn't have allowed the backlog to get to where it has, you wouldn't be boasting about it on earnings calls, and you wouldn't be compensating your CEO when your customers are getting stiffed."

90.     Not only has there been a backlog for new Fire Trucks, but the time it takes to receive a replacement part has also ballooned. Gil Carpenter, a fire chief in Arkansas, said that historically, when he needed a replacement part, his contact from Ferrara would ship him the part the next day. But in 2024, when one of his department's vehicles needed parts, it took more than 10 months to receive replacement parts. This delay left his department without one of its rigs for nearly a year. According to Mr. Carpenter, suppliers who were once responsive have grown more distant and focused on profits.

91.     Fire Truck purchasers' frustrations are born out in the data. In 2022, orders reached 45 percent above average levels, but order fulfilment dropped 9 percent below average levels:



*Image 6: Graph of Fire Truck orders versus shipments.*

92.     The increase in order fulfillment rates since 2022 has not been proportional to the increase in demand.

20

93.     Further, the backlogs are not explained by COVID-19 pandemic supply chain disruptions. By February 2023, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline and has remained at or below that baseline ever since:



*Image 7: Federal Reserve Bank of New York's Global Supply Chain Pressure Index Graphic.*

### 2.      Despite Increasing Demand, Manufacturer Defendants Decided Against Increasing Their Manufacturing Capacity

94.     Despite their ever-increasing backlog of orders, Manufacturer Defendants have taken no steps to meaningfully expand their manufacturing capacity. In fact, REV Group only spends a miniscule fraction of its revenue, approximately 1 percent, on even upgrading its buildings and facilities.

95.     In response to REV Group's decision to not invest in its manufacturing capacity, Alexander Yaggy, a former investor in REV Group's stock, asked, "How can you have a $4 billion backlog and not spend any money to support it?" He concluded that "[i]t's reflective of an uncompetitive market."

96.     Mr. Yaggy's conclusion is correct. Under normal market conditions, an increase in demand would translate into increased manufacturing capacity. But Manufacturer Defendants are

21

not behaving as expected in a typical market because they have conspired to suppress the supply and raise the prices of Fire Trucks.

97. Not only have Manufacturer Defendants not expanded their manufacturing capacity, but they have even taken steps to decrease their ability to fulfill their purchasers' orders.

98. In 2021, REV Group announced that it would stop production at two KME facilities in early 2022. Although REV Group stated that shuttering these facilities would "improve delivery times," the opposite occurred. The process of transferring orders that were in progress at the two KME facilities to other REV Group manufacturing facilities resulted in significant delays. Matthew Timerman, a New York fire chief whose department had ordered a Fire Truck from REV Group to be completed at the KME Pennsylvania plant, learned that the Fire Truck would instead be assembled at three separate manufacturing sites. Mr. Timerman's department received the Fire Truck, after multiple delays, more than four years after the order was placed. Because of the delays in receiving the initially ordered Fire Truck from REV Group, Mr. Timerman's department had to buy a used Fire Truck from another city to keep operations running.

99. Despite the ever-expanding backlogs and the resulting frustration amongst buyers, Manufacturer Defendants do not fear losing their buyers or worry that a competitor might take advantage of the backlogs to steal market share.

100. During a 2023 conference call, Mark Skonieczny, REV Group's chief executive, said that the company did not expect order fulfillment delays to cause cancellations. He also stated, "I don't think [the backlog is] impacting our market share." In other words, Manufacturer Defendants are not worried that any other defendant will build more manufacturing capacity and steal buyers away because of Manufacturer Defendants' joint agreement to suppress supply.

22

101.    In fact, instead of posing a risk to its market share, REV Group views its backlog as valuable to its shareholders as it gives the company "strong visibility into future net sales." REV Group has a long history of publicly signaling the benefits of long backlogs. In June 2018, REV Group publicly stated, while projecting future sales growth, "We are foundationally supported by the continued strength in our order activity, the growth in our backlogs, and our market positions remain strong." At the time, REV Group's Fire Truck backlog was up 7.4 percent to $633.8 million compared to $590.3 million at the end of fiscal year 2017. REV Group described this ballooning backlog as "healthy." By October 2018, its backlog had increased by 19.9% compared to October 2017. From July 2019 to July 2021, its backlog had risen from $776 million to $1.23 billion.



***Image 8: REV Group November 2021 Investor Presentation graphic.***

By 2024, REV Group's specialty vehicle backlog had increased to $3.064 billion (which was "primarily the result of continued demand and strong order intake for fire apparatus and ambulance units"), but REV Group did not express concern about this fact, and instead publicly stated, "[t]he backlog is elevated … but is in line with our industry peers . . . ."

102.    Similarly, Oshkosh advertises its backlog as a valuable characteristic. In a 2020 earnings call, when it reported that Pierce had a "record backlog of more than $1.3 billion," Oshkosh stated that "it puts us in a strong position and provides visibility well into 2021."

23

103.    As its backlog ballooned to $5.67 billion in 2024 ("due to strong demand for fire apparatus and rising prices"), Oshkosh continued to frame its backlog positively as providing "strong visibility over horizon."



*Image 9: Oshkosh 2025 Investor Presentation graphic.*

### E.    Defendants' Successful Inflation of the Price of Fire Trucks Above Competitive Levels

104.    Defendants' agreement to artificially raise prices for Fire Trucks and to exchange competitively sensitive information regarding Fire Trucks has had the intended effect of artificially inflating the prices for Fire Trucks paid by customers and increasing Manufacturer Defendants' revenues.

### 1.    Fire Truck Prices Have Doubled During the Class Period

105.    With demand surging and production stagnating, the cost of Fire Trucks has significantly increased over the past decade. In the mid-2010s, it cost approximately $300,000 to $500,000 to purchase a standard pumper truck. Presently, prices have increased to approximately $1 million per pumper truck. Similarly, although ladder trucks cost approximately $750,000 to $900,000 in the mid-2010s, they now cost approximately $2 million.

24

106.     Mini pumper trucks have also experienced an unprecedented price hike. On an online forum regarding the price of Fire Trucks, one user commented the following in April 2025:

> My department was looking into replacing our 30 year old second due engine with a quick attack mini pumper which would work great for our service area. It's basically a Ford F350 crew cab with a pump, tank, and box on it. When we first priced it 2 years ago, the price tag was $350k. We didn't get the grant so we priced it again the following year to try for the grant again and the price shot up to $500k in just a years time. A small rural department simply doesn't have the money to purchase trucks at these prices.

107.     Another user commented:

> The department I volunteer is a smaller department in Iowa. We run about 225 calls. We recently signed a contract for a new engine that won't get delivered until 2029. The cost of that truck was 1.2 million. We ordered a new engine in 2016, which is basically a twin to our newly ordered truck. Cost on it was $450,000 and took 16 months to get.

108.     Customers suffer, and will continue suffering, from these supracompetitive prices and wait times. During the International Association of Fire Chiefs Conference in 2024, the President of Pierce described the fact that he expects escalating prices coupled with more delays.

109.     Customers have nowhere to turn to find relief from these prices. As one industry executive stated, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"

### 2. Manufacturer Defendants Used "Floating Prices" to Increase Their Profits During the Class Period

110.     Not only are customers already paying exorbitant costs for Fire Trucks, but Manufacturer Defendants have also imposed "floating prices," which result in additional costs for customers.

25

111.    Because of the years-long lead time it takes to fulfill customers' Fire Truck orders, Manufacturer Defendants have added price clauses to their contracts that allow them to increase the final price after the Fire Truck goes into production. This means that customers are often hit was increased costs years after they initially place their order. Mark Fusco, president of Rosenbauer America, has admitted that "surcharges might occur during the build times" on Rosenbauer America customers.

112.    Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony for the September 10th Senate hearing, stating that "[i]n some cases, fire departments are being asked to pay deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

113.    In Massachusetts, a fire department initially ordered one Fire Truck in 2022 and then added two more trucks to their order in 2023. The Fire Truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."

114.    Similarly, in Indiana, a fire department experienced a $100,000 price increase on a Fire Truck it had ordered after a 7-month delay.

**3.    Manufacturer Defendants' Revenues Soared**

115.    Manufacturer Defendants have profited handsomely from their price increases.

116.    During a 2025 investor day presentation, Oshkosh boasted that its adjusted operating margins had grown from 4.8 percent to 10.5 percent from 2022 to 2024, fulfilling its

26

"key 2022 Investor Day targets one year early." Its revenue also soared from $8.3 billion in 2022 to $10.7 billion in 2024, a compound annual growth rate of 14 percent.

117.    In the same presentation, Oshkosh projected that its adjusted operating margins would continue to increase to approximately 12 to 14 percent by 2028. Revenue was also projected to grow and reach upwards of $14 billion during that same period. This revenue growth projection was based on a "strong backlog" and increasing prices.

118.    REV Group advertises comparable growth. In 2024, REV Group's Fire Trucks profit margins increased by an "exceptional 8.9 percent."

119.    In the September 10th Senate hearing, Senator Josh Hawley said to an executive of REV Group, "Your profits have grown five times over the last five years to 250 million dollars, but nobody can get their equipment." In the same hearing, Senator Hawley sharply criticized REV Group for paying dividends to investors and doing stock buybacks rather than investing in addressing the multi-billion-dollar backlog, describing their conduct as "a heist." Indeed, in a 2025 earnings call, REV Group announced that given their strong financial performance, "we made the decision to repurchase approximately 2,900,000.0 shares of our common stock for $88,000,000 within the quarter."

F.    **Defendants' Suppression of Competition Through Information Exchange**

120.    Defendants' information exchange had the likely effect of harming competition in the Fire Trucks market. The information exchange suppresses competition by removing the veil of ignorance between Defendant Manufacturers on prices, supply, demand, inventory, and other key factors which, in a competitive market, would force retailers to compete with one another on price.

121.    A critical factor in assessing the impact of Defendants' information exchange is the fact that the Manufacturer Defendants are competing for sales of the same products: Fire Trucks.

27

Therefore, Manufacturer Defendants compete for customers through price and the time it takes to deliver the ordered Fire Truck, which is precisely the competition that Defendants seek to thwart through their conspiracy.

122. Competition is likely to be harmed where competitors exchange sensitive information on pricing and sales strategies. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of Fire Trucks.

**G.  Plaintiff and Other Class Members were Harmed by Defendants**

123. Competition was, in fact, harmed by Defendants' information exchange. Defendants used the strategic information obtained through FAMA and its various channels detailed *infra* to reduce the uncertainty that they each should have faced from not knowing what their competitors were doing in the market. This strategic information was a material factor in their decisions to create and vigorously enforce their conspiracy. This knowledge tainted what should have been their independent decisions about the price and sales strategies of Fire Trucks. Defendants' information exchange was mutually-reinforcing with its agreement to suppress supply and raise prices. For example, the regular exchange of information, including through FAMA-created channels, allow the Manufacturer Defendants to monitor one another's sales, prices, backlogs, and other metrics to ensure that they are adhering to the conspiracy.

124. The cumulative effect of Defendants' agreements is higher prices for their customers. If Fire Truck prices had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (compared to $1 million), and ladder trucks would cost approximately $1.2 million (compared to $2 million).

125.    The prices increases cannot be explained by market factors such as supply chain and labor shortage challenges.

**H.    Communities Across the United States Have Suffered from Defendants' Conduct**

126.    Not only have customers paid supercompetitive prices for Fire Trucks, but fire fighters and communities across the United States have suffered due to Defendants' anticompetitive conduct. In the September 10th Senate hearing, Edward Kelly, General President of IAFF, described how long backlogs threaten firefighters' ability to protect the communities that they serve. Kelly responded:

> Chief Rubin [Fire Chief of the Kansas City Fire Department] testified earlier, in his city, they had to put, because they did not have enough apparatus on hand to staff the firehouses, they were putting firefighters out basically on pickup trucks like painting crews with ground ladders. Now, if you're trapped in the third or fourth floor, you're jumping.

127.    Kelly provided another harrowing tale of the Defendants' impact on firefighters' ability to protect their communities, explaining that in Chicago, fire fighters who were responding to a deadly house fire – which killed four people, including a five-year-old – were delayed when their Fire Truck stalled. Kelly told Senators, "Fire Fighters had to restart the truck to raise the ladder and rescue victims . . . [a]nd the scariest part is, today on September 10, two-and-a-half months after that incident, that very same rig is still in service."

128.    Jason Shivers, chair of the International Association of Fire Chief's ("IAFC") Emergency Vehicle Management Section, submitted testimony to the U.S. Senate as well, on behalf of the IAFC. He stated Fire Truck costs have risen by 20 to 25 percent since 2020 and fire chiefs can order fire apparatus and expect their delivery in four years. Because of the supracompetitve prices and delays, fire departments have been forced to use apparatus past the 15-year recommended age limit and reserve fleets that do not have up-to-date safety improvements.

29

According to his testimony, these fire apparatus problems affected community safety: "Some fire departments did not have fire apparatus to use for consistent and reliable response to mutual aid response requests from their local neighbors or from across the nation."

129.    These shortages in equipment are so critical that some municipalities are being forced to cancel or postpone the training of new firefighters. On March 26, 2025, the Chief of the Columbus Division of Fire, Jeff Happ, told his division that active Fire Trucks could no longer be used for training, and that any training cadets missed as a result would have to be made up at a later date. The president of the firefighter union, Steven Stein, said in a statement that having to choose between adequately training cadets or removing a valuable Fire Truck from a neighborhood is "unacceptable". In addition, two-thirds of the City of Columbus's fleet are operating outside their recommended life expectancy. The city submitted an order for a new tiller ladder truck from Pierce Manufacturing in November 2023 for $2.3 million (as compared with a similar truck for which they paid roughly $968,000 in 2012). The city was told it could expect delivery in late 2027 or early 2028.

130.    Similarly, Ann Arbor Fire Department Chief Mike Kennedy was told it would take four years for the city to receive a new Fire Truck, and it would cost $2.4 million. The city of Storm Lake, Iowa recently committed $2.8 million over the next ten years to replace a Fire Truck and ladder that is over three decades old.

131.    These problems are not confined to the Midwest. The city of Pittsburgh's fire bureau submitted a Fire Truck fleet replacement plan to its city council, noting that in an ideal situation, Fire Trucks would be used for seven years at the maximum. But Pete McDevitt—city council budget director—stated that with the limited supply and exorbitant price of trucks, it would take more than ten years to replace the fleet's out of date equipment. Robert Brooks, president of

30

the Pennsylvania Professional Firefighters Association, remarked on changes in the industry throughout his career: "Twenty years ago, I started fighting fires, and a ladder truck was about $800,000. Now it's in the $2 million range. An engine, a pumper that was somewhere around $400,000 to $500,000 is now $1 million to $1.2 million."

132.    The Fire Department of Quincy, Massachusetts ordered new Fire Trucks in 2022, but because of manufacturing delays, it has been forced to buy used trucks from other cities. Some of the fire trucks still in rotation in the Quincy fleet are more than twenty years old, and as a result are constantly undergoing repairs. Much like the fire departments in Columbus, Ann Arbor, and Storm Lake, Quincy Fire Department was given a quote of over $2 million and a four year wait time to receive their replacement Fire Trucks.

133.    Some cities have finally had enough. In April 2025, the San Diego County Board of Supervisors voted to pursue legal challenges to what they described as a corporate monopoly of Fire Trucks and firefighting equipment. The Board voted unanimously to explore legal action, citing soaring prices and the substantial increase in wait time to deliver the Fire Trucks, noting the increased consolidation of the market into the hands of just a few companies. In particular, the Board emphasized that the crisis facing California was not being caused by wildfires, but by a supply chain "taken over by corporate consolidation and greed."

## VI.    ANTITRUST INJURY & DAMAGES

134.    Defendants' anticompetitive conduct has had the following effects, among others:

a)      Price competition in Fire Trucks has been restrained or eliminated;

b)      Prices for Fire Trucks sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed,

31

maintained, or stabilized at artificially high, noncompetitive levels throughout the
United States;

c)      Purchasers of Fire Trucks have been deprived of free and open competition; and

d)      Purchasers of Fire Trucks have paid artificially inflated prices.

135.     The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Fire Trucks and, as a direct and foreseeable result, Plaintiff and the Class have paid supracompetitive prices for Fire Trucks during the Class Period.

136.     By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury to their businesses or property, having paid higher prices for Fire Trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

137.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CLASS ACTION ALLEGATIONS

138.     Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking injunctive relief pursuant to federal law, and damages and other relief pursuant to state law on behalf of members of the following Classes:

> **Nationwide Class**: All persons, fire departments, municipalities, and entities who purchased Fire Trucks from any of the Manufacturer Defendants or any of their co-conspirators in the United States at any time from January 1, 2016, until the present.

> **State Law Class**: All persons, fire departments, municipalities, and entities who purchased Fire Trucks from any of the Manufacturer Defendants in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada,

32

New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin at any time from January 1, 2016, until the present.

139. Specifically excluded from these Classes are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

140. Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

141. Class Identity: The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

142. Numerosity: Plaintiff does not know the exact number of Class Members because such information is presently in the exclusive control of the Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

143. Typicality: Plaintiff's claims are typical of the claims of the members of the Classes because Plaintiff purchased a Fire Truck from one or more of the Manufacturer Defendants and was damaged by the same common course of wrongful conduct.

144. Common Questions Predominate: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members, including, but not limited to:

33

a. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Fire Trucks sold in interstate commerce in the United States in violation of federal and state antitrust laws;

b. Whether Defendants agreed to unreasonably restrain trade in violation of federal and state antitrust laws.

c. The identity of the participants of the alleged conspiracy;

d. The scope and duration of the alleged conspiracy;

e. The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

f. The effect of Defendants' alleged conspiracy on the prices Fire Trucks sold in the United States during the Class Period;

g. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Classes;

h. Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

i. The appropriate class-wide measure of damages; and

j. Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Classes.

145. Adequacy: Plaintiff will fairly and adequately protect the interests of the Classes in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the

34

Classes and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Classes.

146. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Classes is impractical and Class Members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

147. Injunctive Relief: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## VIII. FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

148. Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for Fire Trucks.

35

149. The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing, communications on documents, communication of competitively sensitive data to one another through the members-only FAMA-created channels detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators (including customers).

150. Additionally, Defendants fraudulently concealed their wrongful conduct by providing pretextual reasons for their supracompetitive prices and prolonged wait times. For example, in the September 10th Senate Hearing, Mike Virnig, President of REV Group, explained the price increases and delivery times were due to inflation of input and manufacturing costs over recent years, including increased costs of labor, raw materials and other inputs, as well as operational challenges and spikes in demand.

151. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

## IX. CONTINUING VIOLATION

152. During the Class Period, Manufacturer Defendants continued to make sales to Plaintiff and Class Members of Fire Trucks whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants

36

needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

153. Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy.

154. Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of a Fire Truck by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiff and Class Members and started the statutory period running again.

155. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

156. Further, each purchase by Plaintiff and Class Members through the Class Period of Defendants' Fire Trucks, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff and Class Members.

157. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of a Fire Truck to Plaintiff and Class Members constituted a new cause of action for purposes of the statute of limitations.

37

## X. CLAIM FOR RELIEF

### COUNT 1
### Violation of Section 1 of the Sherman Act
### Conspiracy to Restrain Production 15 U.S.C. § 1
### (On behalf of Nationwide Class for Injunctive Relief)

158. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

159. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Fire Trucks in the United States to supracompetitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

160. The contract, combination, or conspiracy alleged herein has had the following effects, among others: (a) Price competition in the sale of Fire Trucks has been restrained, suppressed, and/or eliminated in the United States; (b) Prices for Fire Trucks sold by the Manufacturer or Retailer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; (c) Production of Fire Trucks has been restrained at artificially low levels; and (d) Those who purchased Fire Trucks from the Manufacturer or Retailer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

161. Plaintiff and Nationwide Class Members have been injured and will continue to be injured in their businesses and property by paying more for Fire Trucks purchased from the Manufacturer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

38

162.    Plaintiff and Nationwide Class Members seek a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act and other appropriate equitable relief.

## COUNT 2
### Violation of Section 1 of the Sherman Act
### Exchange of Competitively Sensitive Information 15 U.S.C. § 1
### (On behalf of Nationwide Class for Injunctive Relief)

163.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

164.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Fire Trucks in the United States to supracompetitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

165.    In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

166.    Defendants' information exchange has had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of Fire Trucks at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer Defendants for sales of Fire Trucks.

167.    Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no

39

valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

168.    Each Defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

169.    As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and Class Members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and Nationwide Class Members would have paid less for Fire Trucks.

170.    Plaintiff and Nationwide Class Members seek a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act and other appropriate equitable relief.

## COUNT 3
## Alabama Antitrust Law
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Alabama)

171.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code § 6-5-60, *et seq.* Defendants' unlawful conduct had the following effects: (1) competition for Fire Trucks was restrained, suppressed, and eliminated within Alabama; (2) Fire Truck prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and the Class members in Alabama seek all forms of relief available

40

under Ala. Code § 6-5-60, *et seq*.

## COUNT 4
### Alaska Unfair Trade Practices and Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Alaska)

172.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Alaska, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Alaska. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Alaska; (2) Fire Truck prices in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material

41

to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiff and Class members in Alaska seek all relief available under that statute.

**COUNT 5**
**Arkansas Deceptive Trade Practices Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arkansas)**

173. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arkansas, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Arkansas. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Arkansas; (2) Fire Truck prices in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

42

misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq*., and, accordingly, Plaintiff and Class members in Arkansas seek all relief available under that statute.

**COUNT 6**
**Arizona Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arizona)**

174. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' unlawful conduct had the following effects: (1) competition for Fire Trucks was restrained, suppressed, and eliminated throughout Arizona; (2) Fire Truck prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Arizona have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce and caused Class members in Arizona to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Arizona seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**COUNT 7**
**Arizona Consumer Fraud Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arizona)**

175. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arizona, by affecting, fixing,

43

controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Arizona. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Arizona; (2) Fire Truck prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1521, *et seq.*, and, accordingly, Plaintiff and Class members in Arizona seek all relief available under that statute.

44

## COUNT 8
## California Cartwright Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in California)

176.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout California; (2) Fire Truck prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected California commerce and caused Class members in California to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in California seek all forms of relief available under Cal. Bus. & Prof. Code § 16700, *et seq*.

## COUNT 9
## California Unfair Competition Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in California)

177.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in California, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in California. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of

45

California; (2) Fire Truck prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels in violation of both the Sherman Act and California's Cartwright Act; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected California commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., and, accordingly, Plaintiff and Class members in California seek all relief available under that statute.

**COUNT 10**
**Colorado State Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Colorado)**

178. Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. § 6-4-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Colorado; (2) Fire Truck prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected

46

Colorado commerce and caused Class members in Colorado to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Colorado seek all forms of relief available under Colo. Rev. Stat. § 6-4- 101, *et seq.*

**COUNT 11**
**Colorado Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Colorado)**

179.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Colorado, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Colorado. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Colorado; (2) Fire Truck prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely

47

misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

## COUNT 12
### Connecticut Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Connecticut)

180.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-24, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Connecticut, and (2) Fire Truck prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq.*

## COUNT 13
### District of Columbia Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in
### the District of Columbia)

181.    Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and Purchased Fire Trucks in the District of Columbia, paid supra-competitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in the District of Columbia seek all forms of relief available under D.C. Code § 28-4501, *et seq.*

## COUNT 14
### District of Columbia Consumer Protection Procedures Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in the District of Columbia)

182.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the District of Columbia Consumer Protection Procedures Act, D.C. Code, § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in the District of Columbia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in the District of Columbia. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Truck prices in the District of Columbia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected the District of Columbia's commerce and consumers. As a direct and proximate result of Defendants' violations of law,

49

Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and Class members in the District of Columbia seek all relief available under that statute.

## COUNT 15
### Florida Deceptive and Unfair Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Florida)

183.    Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Florida, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Florida. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Florida; (2) Fire Truck prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class

50

members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*, and, accordingly, Plaintiff and Class members in Florida seek all relief available under that statute.

## COUNT 16
### Hawaii Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Hawaii)

184.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Hawaii; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Plaintiff and members of the Class, including those who resided in the Hawaii and Purchased Fire Trucks in Hawaii, paid supracompetitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected Hawaii commerce and caused Class members in Hawaii to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Hawaii seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

## COUNT 17
### Illinois Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Illinois)

185.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Illinois; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at

51

artificially high levels throughout Illinois; and (3) Plaintiff and members of the Class, including those who resided in the Illinois and Purchased Fire Trucks in Illinois, paid supra-competitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected Illinois commerce and caused Class members in Illinois to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Illinois seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq*.

### COUNT 18
### Illinois Consumer Fraud & Deceptive Business Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Illinois)

186. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Illinois, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Illinois. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair.

187. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Illinois; (2) Fire Truck prices in the State of Illinois were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of

52

money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*, and, accordingly, Plaintiff and Class members in Illinois seek all relief available under that statute.

### COUNT 19
### Iowa Competition Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Iowa)

188.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Fire Truck prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce and caused Class members in Iowa to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Iowa seek all forms of relief available under Iowa Code § 553.1, *et seq.*

### COUNT 20
### Kansas Restraint of Trade Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Kansas)

189.    Defendants have entered into an unlawful agreement in restraint of trade in

53

violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Fire Truck prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Kansas commerce and caused Class members in Kansas to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Kansas seek all forms of relief available under Kan. Stat. Ann. § 50-101, *et seq.*

## COUNT 21
### Maine Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Maine)

190.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. Tit. 10, §1101, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Fire Truck prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce and caused Class members in Maine to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Maine seek all forms of relief available under Me. Stat. Tit. 10, § 1101, *et seq.*

## COUNT 22
### Maryland Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Maryland)

191.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated

54

throughout the State of Maryland; and (2) Fire Truck prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Maryland seek all forms of relief available under Md. Code Ann., Com. Law § 11-201, *et seq.*

## COUNT 23
## Maryland Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Maryland)

192.　Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Maryland, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Maryland. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Maryland; (2) Fire Truck prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Maryland commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of

55

unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law § 13-101, *et seq.*, and, accordingly, Plaintiff and Class members in Maryland seek all relief available under that statute.

## COUNT 24
### Massachusetts Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Massachusetts)

193.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Massachusetts, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Massachusetts. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks.

194.     Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated

throughout the Commonwealth of Massachusetts; (2) Fire Truck prices in the Commonwealth of Massachusetts were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A § 1, et seq., and, accordingly, Plaintiff and Class members seek all relief available under that statute.

**COUNT 25**
**Michigan Antitrust Reform Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Michigan)**

195. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) Fire Truck prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class

57

members in Michigan to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Michigan seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq.*

## COUNT 26
## Michigan Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Michigan)

196. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Michigan; (2) Fire Truck prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely

58

misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws M§ 445.903 *et seq*, and, accordingly, Plaintiff and Class members in Michigan seek all relief available under that statute.

**COUNT 27**
**Minnesota Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Minnesota)**

197.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Minnesota; and (2) Fire Truck prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce and caused Class members in Minnesota to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Minnesota seek all forms of relief available under Minn. Stat. § 325D.49, *et seq.*

**COUNT 28**
**Minnesota Uniform Deceptive Trade Practices Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Minnesota)**

198.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Minnesota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

59

levels, the prices at which Fire Trucks were sold, distributed, or obtained in Minnesota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Minnesota; (2) Fire Truck prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43-48, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

60

## COUNT 29
## Mississippi Antitrust Law
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Mississippi)

199. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. § 75-21-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) Fire Truck prices in the State of Mississippi were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Mississippi commerce and caused Class members in Mississippi to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Mississippi seek all forms of relief available under Miss. Code Ann. § 75-21-1, *et seq*.

## COUNT 30
## Missouri Merchandising Practices Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Missouri)

200. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Missouri, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Missouri. Plaintiff and Class members of purchased Fire Trucks for personal or household purposes. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was

61

restrained, suppressed, and eliminated throughout the State of Missouri; (2) Fire Truck prices in the State of Missouri were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Missouri commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' conduct, as described herein. Upon information and belief, Defendants also directed advertising and marketing efforts for Fire Trucks in the State of Missouri. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.020, *et seq.*, and, accordingly, Plaintiff and Class members in Missouri seek all relief available under that statute.

### COUNT 31
**Montana Unfair Trade Practices & Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Montana)**

201.    Defendants' unfair, unconscionable, or deceptive acts or practices violated the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Montana, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Montana. Defendants'

62

unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Montana; (2) Fire Truck prices in the State of Montana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiff and Class members seek all relief available under that statute.

### COUNT 32
### Nebraska Junkin Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nebraska)

202.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nebraska; and (2) Fire Truck prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nebraska commerce and caused Class members in Nebraska to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Nebraska seek all forms of relief available under Neb. Rev. Stat. § 59-801, *et seq.*

63

## COUNT 33
## Nebraska Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nebraska)

203.     Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Nebraska. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) Fire Truck prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and Class members in Nebraska seek all relief available under that statute.

## COUNT 34
## Nevada Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nevada)

204.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.210, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nevada; and (2) Fire Truck prices in the State of Nevada were raised, fixed,

64

maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nevada commerce and caused Class members in Nevada to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Nevada seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210, *et seq*.

**COUNT 35**
**Nevada Deceptive Trade Practices Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Nevada)**

205.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Fire Truck prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of

65

Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiff and Class members in Nevada seek all relief available under that statute.

**COUNT 36**
**New Hampshire Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in**
**New Hampshire)**

206.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Hampshire; and (2) Fire Truck prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire commerce and caused Class members in New Hampshire to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Hampshire seek all forms of relief available under N.H. Rev. Stat. Ann. § 356:1, *et seq.*

**COUNT 37**
**New Hampshire Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in**
**New Hampshire)**

207.     Defendants' unfair competition or unfair, and unconscionable acts or practices violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*

66

Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Hampshire, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in New Hampshire. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) Fire Truck prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:1, *et seq*., and, accordingly, Plaintiff and Class members in New Hampshire seek all relief available under that statute.

### COUNT 38
### New Jersey Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New Jersey)

208.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Jersey; (2) Fire Truck prices in the State of New Jersey were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Jersey commerce and caused Class members in New Jersey to pay supracompetitive

67

prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Jersey seek all forms of relief available under N.J. Stat. Ann. § 56:9-1, *et seq*.

## COUNT 39
### New Mexico Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New Mexico)

209. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Truck prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce and caused Class members in New Mexico to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Mexico seek all forms of relief available under N.M. Stat. Ann. § 57-1-1, *et*

## COUNT 40
### New Mexico Unfair Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New Mexico)

210. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the N.M. Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fire Trucks were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and Class members. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and Class members and

68

the prices paid by them for Fire Trucks as set forth in N.M. Stat. § 57-12-2E. Plaintiff and Class members were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiff and Class members had no power to negotiate a lower price. Moreover, Plaintiff and Class members lacked any meaningful choice in purchasing Fire Trucks because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and Class members could avoid the overcharges. Defendants' conduct with regard to sales of Fire Trucks, including their illegal conspiracy to secretly fix the price of Fire Trucks at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and Class members. Defendants took grossly unfair advantage of Plaintiff and Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Fire Trucks. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Truck prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and Class members in New Mexico seek all relief available under that statute.

69

## COUNT 41
### New York Donnelly Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New York)

211. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New York; (2) Fire Truck prices in the State of New York were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New York commerce and caused Class members in New York to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New York seek all forms of relief available under N.Y. Gen. Bus. Law § 340, *et seq.*

## COUNT 42
### North Carolina Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in
### North Carolina)

212. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) Fire Truck prices in the State of North Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce and caused Class members in North Carolina to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in North Carolina seek all forms of relief available under N.C. Gen. Stat. § 75-1, *et seq.*

70

**COUNT 43**
**North Dakota Uniform State Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in North Dakota)**

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01 *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of North Dakota; (2) Fire Truck prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce and caused Class members in North Dakota to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in North Dakota seek all forms of relief available under N.D. Cent. Code § 51-08.1- 01, *et seq*.

**COUNT 44**
**Oregon Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Oregon)**

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Truck prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Oregon commerce and caused Class members in Oregon to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Oregon seek all forms of relief available under Or. Rev. Stat. § 646.725, *et seq*.

71

## COUNT 45
## Oregon Unfair Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Oregon)

215.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Oregon, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Oregon. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Truck prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Oregon commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair

72

competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*,

and, accordingly, Plaintiff and Class members in Oregon seek all relief available under that statute.

## COUNT 46
### Pennsylvania Unfair Trade Practices & Consumer Protection Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Pennsylvania)

216.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or

practices violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law

("PUTPCPL"), 73 Pa. Stat. Ann. § 201-1, *et seq*. The PUTPCPL prohibits "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73

Pa. Stat. Ann. § 201-3. Among other things, the PUTPCPL prohibits "[e]ngaging in any other

fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

73 Pa. Stat. Ann. § 201-2(4)(xxi). Plaintiff and Pennsylvania Class members purchased Fire

Trucks  primarily for personal or household use. Defendants agreed to, and did in fact, act in

restraint of trade or commerce in Pennsylvania, by affecting, fixing, controlling, and/or

maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold,

distributed, or obtained in Pennsylvania. Defendants deliberately failed to disclose material facts

to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated

prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that

Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the

following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated

throughout the Commonwealth of Pennsylvania; (2) Fire Truck prices in the Commonwealth of

Pennsylvania were raised, fixed, maintained, and stabilized at artificially high levels; and (3)

individuals have been deprived of free and open competition. Defendants' illegal conduct

substantially affected Pennsylvania commerce and consumers. As a direct and proximate result of

73

Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 P.S. § 201-1, *et seq.,* and, accordingly, Plaintiff and Class members in Pennsylvania seek all relief available under that statute.

### COUNT 47
### Rhode Island Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Rhode Island)

217.     Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-7, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Truck prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Rhode Island commerce and caused Class members in Rhode Island to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Rhode Island seek all forms of relief available under R.I. Gen. Laws § 6-36-7, *et seq.*

74

## COUNT 48
### Rhode Island Unfair Trade Practice and Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Rhode Island)

218. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Truck prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members

75

as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and Class members in Rhode Island seek all relief available under that statute.

## COUNT 49
## South Carolina Unfair Trade Practices Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in South Carolina)

219.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Carolina; (2) Fire Truck prices in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants unlawful conduct, Plaintiff and South Carolina Class members have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiff and Class members in South Carolina seek all relief available under that statute.

## COUNT 50
## South Dakota Antitrust Law
## (On Behalf of State Law Class Members that Purchased Fire Trucks in South Dakota)

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws § 37-1-3.1, *et seq.* Defendants' unlawful conduct had the

76

following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Truck prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce and caused Class members in South Dakota to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in South Dakota seek all forms of relief available under S.D. Codified Laws § 37-1-3.1, *et seq*.

## COUNT 51
### South Dakota Deceptive Trade Practices and Consumer Protection Statute
### (On Behalf of State Law Class Members that Purchased Fire Trucks in South Dakota)

221.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Truck prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and

77

Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiff and Class members in South Dakota seek all relief available under that statute.

**COUNT 52**
**Tennessee Fair Trade Practice Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Tennessee)**

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Trucks was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Fire Trucks, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce and caused Class members in Tennessee to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Tennessee seek all forms of relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

78

## COUNT 53
## Utah Antitrust Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Utah)

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. § 76-10-3101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Trucks was restrained, suppressed, and eliminated throughout the State of Utah; (2) prices for Fire Trucks in the State of Utah were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Utah commerce and caused Class members in Utah to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Utah seek all forms of relief available under Utah Code Ann. § 76-10-3101, *et seq*.

## COUNT 54
## Vermont Antitrust Law
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Vermont)

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Fire Truck prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Vermont commerce and caused Class members in Vermont to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Vermont seek all forms of relief available under 9 Vt. Stat. Ann. § 2465, *et seq*.

79

## COUNT 55
## West Virginia Antitrust Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in West Virginia)

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code § 47-18-1, *et seq*. Defendants' Conspiracy had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Fire Truck prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia and caused Class members in West Virginia to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in West Virginia seek all forms of relief available under W. Va. Code § 47-18-1, *et seq*.

## COUNT 56
## Wisconsin Antitrust Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Wisconsin)

226.    Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of Wis. Stat. § 133.03 *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) Fire Truck prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin and caused Class members in Wisconsin to pay supracompetitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Wisconsin seek all forms of relief available under Wis. Stat. § 133.03.

80

# XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests judgment against Defendants, as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and state antitrust and common law;

C.    That Plaintiff and the State Law Class recover damages to the maximum extent allowed under state antitrust law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

81

manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.     That Plaintiff and State Law Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.     That Plaintiff and Class Members recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.     That Plaintiff and the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XII.     DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of Class Members, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: November 4, 2025                    Respectfully submitted,

/s/ Brian G. Weber
Brian G. Weber (#1024963)
JOHNS, FLAHERTY & COLLINS, S.C.
Exchange Building
205 Fifth Avenue South, Suite 600
La Crosse, WI 54602
Telephone: (608) 784-5678
brian@johnsflaherty.com

Daniel E. Gustafson
Daniel C. Hedlund
Joshua J. Rissman
Gabrielle M. Kolb
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com

82

dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
gkolb@gustafsongluek.com

*Counsel for Plaintiff City of Onalaska and the Proposed Classes*